EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re:<br><br>    José Davison Lampón | Queja<br><br>2003 TSPR 92<br><br>159 DPR _____ |

Número del Caso: AB-1997-14


Fecha: 12/mayo/2003


Oficina de Inspección de Notarías:
                        Lcda. Carmen H. Carlos
                        Directora


Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

                                          AB-1997-14

José Davison Lampón

Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 12 de mayo de 2003

La conducta que da lugar a la presente acción disciplinaria tiene su génesis en el caso Rodríguez Morales v. Registrador, 142 D.P.R. 347 (1997). En éste nos percatamos del hecho que el Lcdo. José A. Davison Lampón[1], notario que autorizó la escritura de venta judicial allí en controversia, había fotocopiado en dicha escritura los textos del Mandamiento de Ejecución y el Acta de Subasta en lugar de transcribir

---

[1] Admitido por este Tribunal al ejercicio de la abogacía el 11 de junio de 1969 y al del notariado el 12 de junio de 1970.

los mismos.[2] Observamos, además, una discrepancia entre el precio de tasación consignado en la escritura de venta judicial y el precio fijado como tipo mínimo en la sentencia fotocopiada en la referida escritura. En aquel momento este Tribunal señaló:

> Nos provoca una gran preocupación que los notarios estén desarrollando como práctica el incorporar a un instrumento público el texto de algún documento fotocopiándolo, en lugar de transcribirlo en dicho instrumento.
>
> Además, en el caso de autos surge una contradicción entre el precio de tasación consignado en el párrafo CUARTO de la escritura de venta judicial y el precio de tasación fijado como tipo mínimo en la sentencia fotocopiada en dicha escritura.
>
> Por lo anterior, remitiremos este caso a la Oficina de Inspección de Notarías (ODIN), para la correspondiente investigación e informe a este Tribunal.[3]

En cumplimiento con tal requerimiento, la Lcda. Carmen H. Carlos, Directora de la Oficina de Inspección de Notarías (ODIN), sometió ante este Tribunal un informe calificando como incorrecta la práctica de fotocopiar el texto de algún documento en la escritura matriz; a tales efectos, señaló que combinar indiscriminadamente distintas técnicas de incorporación de escritura en la redacción del original atentaba contra la integridad del contenido del

---

[2] Hemos incluido, como Apéndice A, los Incisos de la escritura en los cuales en notario incurrió en la práctica antes descrita.

[3] Tal encomienda se efectuó mediante Resolución del 31 de enero de 1997.

documento y configía con el principio de autoría del instrumento matriz.

En cuanto a la discrepancia observada en el precio mínimo para la primera subasta, fijado en $15,000.00 en la sentencia y en $12,875.00 en el acta de subasta, la Lcda. Carlos expresó que el notario debió examinar los documentos referentes a la subasta previo a redactar la escritura de venta judicial y que, como profesional del Derecho, debió percatarse que el precio mínimo fijado para la primera subasta era diferente al utilizado por el alguacil al efectuar la misma. En vista de ello, sostuvo que la actuación del Lcdo. Davison Lampón constituyó un error fundamental en el descargo de su responsabilidad notarial.

Debe señalarse que, en el referido informe la Directora de la Oficina de Inspección de Notarías plasmó la posición del notario con relación a ambos señalamientos. Refiriéndose al primer asunto --incorporar mediante fotocopia el Mandamiento de Ejecución y el Acta de Subasta-- el Lcdo. Davison Lampón expresó que había adoptado la "iniciativa de incluir en la redacción del instrumento público el traslado literal mediante la utilización del mecanismo fotográfico por medio electrónico por constituir este medio uno veraz, confiable, formal, y permanente que evita la comisión de errores." Adujo que el referido mecanismo está permitido por los Artículos 39 y 45 de la Ley Notarial, 4 L.P.R.A. secs. 2061 y 2067, y que no

constituye fundamento para decretar la nulidad de los instrumentos públicos.[4]

Refiriéndose al asunto de la discrepancia en el tipo mínimo utilizado en la subasta, el Lcdo. Davison Lampón expresó que:

> La escritura objeto del presente escrito se ajusta la causa de $12,875.00 al acta de subasta que da lugar al instrumento público. No merece explicación por ser hecho claro que la primera subasta según el mandamiento de ejecución es de $15,000.00, todo lo que demuestra un error que requiere el celebrar una nueva subasta y una nueva escritura de venta judicial. El error señalado no tiene consecuencias que menoscaben derecho alguno de la parte que tiene una sentencia a su favor que es final, firme e inapelable de una ejecución de pagaré hipotecario por la vía ordinaria sobre el mismo predio que como objeto describe la escritura de venta judicial.

En vista de que en el presente caso no existe controversia sobre los hechos, no hubo necesidad de designar un Comisionado Especial para que rindiera un informe. *In re* Irizarry Vega, res. 24 de agosto de 2000, 2000 T.S.P.R. 128. Siendo ello así, procedemos a resolver la controversia sin ulterior trámite.[5]

---

[4] Adviértase que ninguno de estos artículos está relacionado con la redacción de escrituras matrices, sino que, por el contrario, disponen los requisitos relativos a la expedición de copias certificadas.

[5] Véase Regla 14(e)(h) del Reglamento del Tribunal Supremo de Puerto Rico de 1 de mayo de 1996.

I

No cabe duda que la notaría es una función de cuidado que debe ser ejercida con suma diligencia y celo profesional. *In re* Charbonier Laureano, res. el 11 de abril de 2002, 2002 T.S.P.R. 53; *In re* Vera Vélez, res. el 5 de abril de 1999, 99 T.S.P.R. 46; *In re* Torres Olmeda, 145 D.P.R. 384, 392 (1998); *In re* Bringas Rechani, 128 D.P.R. 132, 134 (1991); *In re* Rodríguez Mena, 126 D.P.R. 205, 207 (1990); *In re* Alvarado Tizol, 122 D.P.R. 587, 589 (1988). En armonía con lo anteriormente expresado, en reiteradas ocasiones, este Tribunal ha sostenido que los notarios están obligados a cumplir estrictamente con lo dispuesto en la Ley Notarial de Puerto Rico, 4 L.P.R.A. sec. 2002 *et seq.*, en los Cánones del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, y en el contrato entre las partes. La inobservancia de tal obligación expone al notario a la acción disciplinaria correspondiente. *In re* Verdejo Roque, res. el 21 de febrero de 2001, 2001 T.S.P.R. 26, *In re* Rodríguez Báez, 129 D.P.R. 819 (1992).

Así, la Ley Notarial exige el cumplimiento de ciertos requisitos de forma, en la redacción de los instrumentos públicos, con el fin de garantizar su autenticidad y minimizar al máximo las posibilidades de adulteración.[6] Por ejemplo, la Ley reglamenta el tamaño del papel en el cual

---

[6] Véase: Sarah Torres Peralta, El Derecho Notarial Puertorriqueño, San Juan, Publicaciones STP, Inc., 1995, pág. 8.50, citando a Pedro Ávila Álvarez, Derecho Notarial, 6ta ed., Barcelona, Editorial Bosch, 1986, pág. 24.

deben ser redactados los instrumentos públicos[7], las medidas específicas que deberán tener sus márgenes[8] y el uso de abreviaturas y guarismos.[9] Además, se dispone que el notario no podrá dejar espacios en blanco en el texto del instrumento.[10]

En lo que respecta a la grafía del instrumento público, la Ley distingue entre las escrituras matrices y las copias certificadas. En relación con las primeras, se dispone que podrán ser redactadas "en manuscrito, siempre que se use tinta indeleble, impresos o en maquinilla con cinta indeleble o por otros mecanismos electrónicos o mecánicos que produzcan documentos indelebles y permanentes."[11] Por el contrario, al referirse a las copias certificadas de escrituras matrices, en su Artículo 45, 4 L.P.R.A. sec. 2067, la Ley dispone que las mismas podrán ser "fotográficas o reproducidas por cualquier otro medio electrónico".

Sobre este particular, es menester señalar que tanto la Ley como el Reglamento definen la escritura matriz como aquella que el notario redacta a ruego de los comparecientes. Específicamente, el Artículo 13 de la Ley, 4 L.P.R.A. sec. 2031, la describe como: "la original que el

---

[7] 4 L.P.R.A. sec. 2055.

[8] *Ibid.*

[9] 4 L.P.R.A. sec. 2045.

[10] 4 L.P.R.A. sec. 2050.

[11] 4 L.P.R.A. sec. 2045.

(Continúa . . .)

notario ha de redactar sobre el contrato o acto sometido a su autorización." Por su parte, la Regla 19 del Reglamento Notarial, T.4 Ap. XXIV R.19, define la escritura matriz como: el "original que el notario redacta sobre el contrato, acto o hecho que remite, firmado por los comparecientes y los testigos, si hubiere, rubricado, signado y firmado por el notario..." Es de notar que la diferencia básica entre la escritura matriz y la copia certificada es que una de ellas, la primera, es la original que es redactada por el notario mientras que la otra es una mera reproducción de la original.[12]

Ahora bien, ¿puede el notario autorizante de una escritura matriz incorporar, al instrumento público que autoriza, el texto de un documento fotocopiando el mismo en uno de sus folios en lugar de transcribirlo? ¿Constituye el acto de "fotocopiar" un medio de redacción capaz de producir instrumentos públicos matrices "indelebles y permanentes"? Contestamos ambas interrogantes en la negativa. Lo contrario, pondría en grave peligro la integridad y autenticidad del instrumento público y debilitaría los cimientos que sustentan la fe pública notarial. Veamos.

A

_____

[12] Como es sabido, la redacción de la escritura matriz puede llevarse a cabo a manuscrito, mediante el uso de maquinilla, procesadores de palabra o utilizando documentos o formas preimpresas. Lo importante es que las mismas tienen que conformar un todo integrado.

Sabido es que la fe pública notarial constituye el elemento principal de todo el esquema de autenticidad documental. *In re* Feliciano Ruiz, 117 D.P.R. 269, 275 (1986).[13] Por virtud de la intervención del notario, custodio de esa fe pública, el documento notarial goza de tres atributos esenciales: autenticidad, corrección y exactitud. Enrique Giménez-Arnau, Derecho Notarial, Pamplona, Ed. Universidad de Navarra, S.A., 1976, T. II, pág. 397. Lo característico del instrumento público es precisamente su presunción de veracidad y su fuerza probatoria. *Ibid.* a la pág. 398. Su origen público genera su eficacia de hacer fe, lo cual permite que sea, siempre y en toda su integridad, documento auténtico. *Ibid.* a la pág. 401.

Los singulares efectos que se conceden al instrumento público, su legitimación para el tráfico y la credibilidad impuesta por el Estado a su contenido justifican que en su confección se exijan una serie de requisitos formales que garanticen su autenticidad y hagan estadísticamente despreciable el porcentaje de posibilidades de adulteración. Sarah Torres Peralta, El Derecho Notarial Puertorriqueño, San Juan, Publicaciones STP, Inc., 1995,

---

[13] Véase, además: *In re* Criado Vázquez, res. el 29 de octubre de 2001, 2001 T.S.P.R. 154; *In re* Díaz Ortiz, res. el 29 febrero de 2000, 2000 T.S.P.R. 53.

Pág. 8.50, citando a Pedro Ávila Álvarez, Derecho Notarial, 6ta ed., Barcelona, Editorial Bosch, 1986, pág. 24.

Permitir que el texto de algún documento sea incorporado en el cuerpo del instrumento público matriz, fotocopiando el mismo en uno de sus folios, atentaría contra la integridad del instrumento afectando la presunción de veracidad impartida por la fe pública notarial. ¿Cómo asegurar la autenticidad de un documento cuyo texto puede ser fácilmente sustituido haciendo uso de ciertas estrategias técnicas provistas por la magia de las máquinas fotocopiadoras? ¿Qué efecto práctico tendrían las formalidades exigidas en la Ley y Reglamento Notarial si permitimos tal inserción?

Otra situación que podría suscitarse con tal práctica es, precisamente, la comisión de errores en el proceso de redacción del instrumento público --como en efecto ha ocurrido en el caso de autos-- ya que el notario podría descuidar la obligación que tiene de examinar los detalles del documento que fotocopia. No cabe duda que la transcripción del documento, o parte del mismo, en la escritura que se autoriza asegura que el notario ha leído y examinado el mismo, minimizando así la comisión de errores en documentos notariales.

Lo antes expuesto es más que suficiente para concluir que la práctica de incorporar, mediante fotocopia, algún documento al instrumento matriz debe ser enérgicamente rechazada por este Tribunal. Dicha práctica no sólo pone en

jaque características esenciales del instrumento público, sino que, además, incide directamente contra la fe pública notarial.

Por otra parte, es de notar que tanto la Ley Notarial como su Reglamento describen la escritura matriz como aquella que el notario "redacta" sobre el contrato o acto sometido a su consideración.[14] No hemos encontrado disposición alguna, ni en la Ley ni el Reglamento Notarial, de la cual se pueda inferir que el acto de "fotocopiar" el texto de un documento en el cuerpo de la escritura matriz pueda estar comprendido dentro del término "redacción" que utiliza la Ley. En ese sentido debe quedar claro que bajo ningún concepto podrán ser utilizados mecanismos electrónicos para intercalar documentos al texto de la escritura matriz.

II

En lo que respecta al asunto de la discrepancia observada entre el precio de tasación consignado por el notario en la escritura de venta judicial y el precio fijado como tipo mínimo en la sentencia fotocopiada en dicha escritura, coincidimos con lo expresado por la Directora de ODIN en cuanto a que este error constituyó uno fundamental. Bajo ningún concepto podemos avalar el

---

[14] Así, pues, se permite que tal redacción sea en manuscrito, maquinilla o mediante el uso de cualquier otro mecanismo electrónico capaz de producir documentos indelebles y permanentes.

argumento del notario a los efectos de que se trató de un simple error que sólo conlleva la celebración de una nueva subasta y una nueva escritura de venta judicial. No podemos minimizar a tal grado la falta incurrida por el Lcdo. Davison Lampón. Todo lo contrario, estamos ante un proceso de subasta celebrado en contravención con lo dispuesto en el Artículo 221 de la Ley Hipotecaria,[15] circunstancia que fue totalmente ignorada por el Lcdo. Davison a pesar de tener ante sí elementos de juicio suficientes para detectar el mismo.

Es evidente que el Lcdo. Davison faltó a su deber de calificar los documentos que tenía ante sí, autorizando una escritura sin asegurarse de la legalidad del negocio que en virtud de ella se concretaba. Con ello defraudó la fe pública, menospreciando los postulados más esenciales de su ministerio. Veamos.

En reiteradas ocasiones este Tribunal ha sostenido que en nuestra jurisdicción el notario ejerce una función dual. Por un lado, es un funcionario que realiza una función pública y, por el otro, es un técnico profesional del Derecho.[16] Ahora bien, no se trata de que el notario en unas

---

[15] 30 L.P.R.A. sec. 2721. Este artículo dispone que el tipo mínimo para la subasta será el precio en que se haya tasado la finca en la escritura de constitución de hipoteca que se ejecuta.

[16] A tales efectos, véase: *In re* Criado Vázquez, ante; *In re* Igartúa Muñoz, res. el 2 de febrero de 2001, 2001 T.S.P.R. 13; *In re* Bryan, Vargas, res. el 3 de enero de 2000, 2000 T.S.P.R. 1; *In re* Capestany Rodríguez, res. el 30 de junio de 1999, 99 T.S.P.R. 109; *In re* Colón Ramery, 133 D.P.R.

(Continúa . . .)

ocasiones ejerza como funcionario público y en otras como profesional del Derecho, <u>sino que ambas funciones se hallan imbricadas de forma tal que resulta imposible ubicarlo, nítidamente y sin reservas, dentro del campo del Derecho Público o del Derecho Privado</u>. Juan-Francisco Delgado de Miguel, *La función notarial*, II Revista Jurídica del Notariado, pág. 235 (1993); Enrique Giménez-Arnau, <u>Introducción al Derecho Notarial</u>, Madrid, Ed. Revista de Derecho Privado, 1944, pág. 47.

Partiendo de tales postulados, en <u>*In re* Meléndez Pérez</u>, 104 D.P.R. 770, 775 (1976), sostuvimos que en Puerto Rico <u>la función del notario trasciende la de un autómata legalizador de firmas y penetra al campo de la legalidad de la transacción que ante él se concreta</u>.[17] Al autorizar un documento, éste da fe pública y asegura que el mismo cumple con todas las formalidades de ley, formal y sustantivamente, que es legal y verdadero, y que se trata

_____

555 (1993); <u>*In re* Colón Muñoz</u>, 131 D.P.R. 121 (1992); <u>Ramírez Lebrón</u> v. <u>Registrador</u>, 131 D.P.R. 76 (1992); <u>*In re* Cruz Cruz</u>, 126 D.P.R. 448 (1990); <u>Chévere</u> v. <u>Cátala</u>, 115 D.P.R. 432 (1984); <u>*In re* Feliciano</u>, 115 D.P.R. 172 (1984); <u>*In re* Meléndez Pérez</u>, 104 D.P.R. 770 (1976).

[17] En su Artículo 2, 4 L.P.R.A. sec. 2002, la Ley Notarial lo define como aquel "profesional del Derecho que ejerce una función pública, autorizado para dar fe y autenticidad conforme a las leyes de los negocios jurídicos y demás actos y hechos extrajudiciales que ante él se realicen, sin perjuicio de lo dispuesto en las leyes especiales." Este mismo artículo nos señala que la función notarial consiste en "recibir e interpretar la voluntad de las partes, dándole forma legal, redactar las escrituras y documentos notariales a tal fin y conferirle autoridad a los mismos." *Ibid.*

de una transacción válida y legítima. *In re* Feliciano Ruiz, ante, a la pág. 275.

Cónsono con lo anterior, en Chévere v. Cátala, 115 D.P.R. 432, 438 (1984), señalamos que al autorizar una escritura el notario tiene cuatro deberes principales. Éstos son: (i) indagar la voluntad de los otorgantes; (ii) formular la voluntad indagada; (iii) investigar ciertos hechos y datos de los que depende la eficacia o validez del negocio; y (iv) darles a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendan el sentido, así como los efectos y consecuencias, del negocio, y se den cuenta de los riesgos que corren en celebrarlo.[18]

Íntimamente relacionado con el deber de investigar los hechos, de los cuales depende la validez o eficacia del acto, está el deber del notario de examinar los antecedentes del negocio que autoriza. A tales efectos, en el precitado caso de Chévere v. Cátala, ante, a las págs. 442-443, citando a Ávila Álvarez,[19] expresamos:

> La buena práctica notarial exige el examen de los antecedentes en la redacción del instrumento público.
> 'Si el instrumento se redactase a base de las declaraciones de las partes simplemente no podría sentarse la presunción de legalidad y validez del negocio (por la probabilidad de que hubiese no sólo mala fe sino, también, impericia técnica en

---

[18] Citando a D. Winfried Kralik, *El deber de informar del notario*, 22 Anales de la Academia Matritense del Notariado, Vol. II, pág. 11 (1982).

[19] P. Ávila Álvarez, Estudios de Derecho Notarial, 4ta ed., Madrid, Ed. Montecorvo, 1973, págs. 402-403.

la exposición de los antecedentes por los interesados), ni la escritura quedaría completa, pues requeriría ir acompañada constantemente de la prueba documental que debió presentarse al Notario. Es preciso que la escritura descanse en la calificación del Notario (sobre los presupuestos del negocio), que descarte la probabilidad de mala fe, por la responsabilidad notarial, y de impericia, por la preparación técnica de dicho funcionario. De aquí el derecho de éste (reconocido por el Reglamento Notarial en varios preceptos) de examinar los documentos necesarios para su calificación, y de aquí que sólo en casos excepcionales deba dispensar de la presentación de los mismos.'

A tono con lo anterior, hemos sido enfáticos al expresar que la función del notario comprende el asegurarse de la legalidad de toda transacción que ante él se concreta. *In re* Criado Vázquez, ante. Ello implica que, en su deber de ilustrar y dar consejo legal a las partes contratantes, no exista guardarraya que separe al notario del abogado. *In re* Meléndez Pérez, ante, a la pág. 775. Es más, este Tribunal ha ido más allá al exigirle al notario que, en virtud del entrenamiento legal que posee, ejerza una función previsora frente a aquellos que ante él comparecen. Rodríguez Sardenga v. Soto Rivera, 108 D.P.R. 733, 741 (1979).

Lo antes expuesto necesariamente significa que el notario no sólo debe conocer la norma, exigencia de todo jurista, sino que, además, debe saber interpretarla e integrarla en el plano general del ordenamiento jurídico que sólo el profesional del Derecho está en condiciones de hacer. Juan-Francisco Delgado de Miguel, *La función notarial*, II Revista Jurídica del Notariado, pág. 235

(1993).[20] A tales efectos, en *In re* Feliciano Ruiz, ante, a la pág. 275, sostuvimos que, como profesional del Derecho, el notario tiene la obligación de conocer las leyes, la doctrina, las costumbres y la jurisprudencia.[21]

Del mismo modo, en *In re* González Maldonado, res. el 20 de diciembre de 2000, 2000 T.S.P.R. 192, señalamos que por la importancia que reviste la figura del notario, dentro del tráfico jurídico de bienes, éste tiene que ser en extremo cuidadoso, desplegando con sumo esmero su desempeño profesional. Ello implica que el notario tiene la obligación de mantenerse al día y seguir las disposiciones legales que reglamentan esta profesión, así como la doctrina y la jurisprudencia. Ciertamente, si no fuera así,

---

[20] Sobre este particular se ha señalado que:

> [e]l notario necesita, ante todo, ser jurista y tener agudo sentido jurídico, para lo que no bastan los conocimientos empíricos, y , por otra parte, llevar a la realidad de una composición literaria --el instrumento-- las convenciones de las partes y los actos jurídicos que con su intervención realizan los particulares, para lo cual no es suficiente el conocimiento científico del Derecho --aun siendo muy necesario--, sino que ha de poseer una técnica, una manera de obrar, que es lo que constituye el arte de la redacción del instrumento, como el Juez ha de poseer el arte de dictar sentencias y el Letrado la oratoria aplicada al foro. Honorio García García, *Introducción a la técnica de la redacción de instrumentos públicos*, Revista de Derecho Notarial Núms. 1 - 2 (1953).

[21] Sobre este particular, expresa Giménez-Arnau que "[l]a actuación del notario no se limita a crear una prueba preconstruída, sino que tiene una función interpretativa, aunque no sea judicial, de las normas legales." Enrique Giménez-Arnau, Introducción al Derecho Notarial, Madrid, Ed. Revista de Derecho Privado, 1944, pág. 47.

¿para qué serviría, entonces, su profesión de abogado por ley puesta a disposición de las partes en su despacho notarial? *Ibid.*

Finalmente, es menester recordar que el notario ejerce una función de "primer calificador" sobre la legalidad y suficiencia de los documentos que autoriza. Gasolinas de Puerto Rico Corp. v. Keeler Vázquez, res. el 15 de noviembre de 2001, 2001 TSPR 158. Así, pues, se trata de una especie de "labor preventiva", íntimamente ligada a la certeza y seguridad jurídica provista por la intervención notarial. Es en tal virtud que se le exige al notario una mayor aportación técnica y un examen cuidadoso de los documentos que se le presentan y de las transacciones o negocios jurídicos que ante él se concretan.

En el caso de autos, se permitió una postura inferior al precio de tasación pactado por las partes en la escritura de constitución de hipoteca. Dicha "desviación" surgía claramente del acta preparada por el alguacil, donde éste hacía constar que el inmueble había sido adjudicado a los esposos Rodríguez-Colón en la primera subasta por el precio de doce mil ochocientos setenta y cinco dólares ($12,875.00), identificando tal cantidad como el tipo mínimo fijado. Ello era contrario a lo dispuesto en la sentencia emitida por el foro de instancia, incluida ésta en el mandamiento judicial que el notario tuvo ante sí, donde el tribunal dispuso que el tipo mínimo para la

primera subasta había sido fijado en quince mil dólares ($15,000.00).

Si el notario Davison Lampón hubiera realizado un examen cuidadoso de los documentos presentados por las partes al momento de autorizar la escritura de venta judicial, --deber que tenía como "primer calificador" de los instrumentos que autentica-- se hubiera percatado de que existía una discrepancia entre el tipo mínimo establecido en la sentencia y el mencionado en el acta de subasta. Ello hubiera sido suficiente para que, como técnico conocedor del Derecho, intuyera que la venta judicial celebrada había sido realizada en contravención con lo dispuesto en el Artículo 221 de la Ley Hipotecaria, ante. En tales circunstancias, el notario debió negarse a elevar a escritura pública un acto contrario a la Ley Hipotecaria, procediendo a asesorar a las partes en torno a la ilegalidad de la venta celebrada.

Por otro lado, es menester resaltar el hecho de que en la escritura que nos atañe el notario Davison Lampón expresó un hecho que no era correcto al afirmar que el inmueble subastado estaba tasado en doce mil ochocientos setenta y cinco dólares ($12,875.00), información que, como hemos visto, era errónea. Sobre este particular en *In re Rivera Arvelo y Ortiz Velázquez*, 132 D.P.R. 840, 863 (1993), señalamos que <u>faltar a la veracidad de los hechos</u> es una de las <u>faltas más graves</u> que como custodio de la fe

pública puede cometer un notario.[22] Véase, además: *In re Vera Vélez*, ante. Con ello, no sólo se quebranta la fe pública notarial, sino que, además, se socava la "integridad de la profesión". *Ibid*. En virtud de lo anterior, fue que en *In re* Martínez, Odell II, res. el 25 de junio de 1999, 99 TSPR 119, señalamos que "[m]ás que un ideal irrealizable, la verdad es atributo inseparable del ser abogado y, sin la misma, no podría la profesión jurídica justificar su existencia."

Debe mantenerse presente que, en reiteradas ocasiones, hemos sostenido que para incurrir en esta falta no es necesario que el notario haya faltado a la verdad intencionalmente. *Ibid*. Véase, además: *In re* Charbonier Laureano, ante. Por el contrario, la falsedad puede ser el resultado de una labor carente del celo y la cautela que exige la función pública del notario o de la excesiva confianza en las manifestaciones de los comparecientes. *In re* Rivera Arvelo y Ortiz Velázquez, ante.[23] Esta es precisamente la situación que hoy tenemos ante nos.

––––––––––––––––––

[22] Faltar a la verdad implica, además, una violación al Canon 35 del Código de Ética Profesional, 4 L.P.R.A. Ap. XI C.35. En lo pertinente este canon reza:

> El abogado debe ajustarse a la sinceridad de los hechos al examinar los testigos, al redactar afidávit u otros documentos, y al presentar causas... (énfasis suplido).

[23] Precisamente "para evitar que un notario asevere, consciente o inconscientemente, un hecho falso, este Tribunal le ha impuesto el deber de hacer las averiguaciones mínimas que requieren las normas más

(Continúa . . .)

En el caso de autos <u>no</u> existe el más mínimo indicio de que el Lcdo. Davison Lampón haya actuado de mala fe o con la intención de engañar o beneficiarse personalmente. Más bien, su falta parece ser el fruto del descuido al no examinar con el debido cuidado los documentos presentados por las partes al momento de autorizar la escritura aquí en controversia. Abona a tal descuido el hecho de haber fotocopiado el mandamiento de ejecución y el acta de subasta a la escritura otorgada. No cabe duda que el ejercicio de un grado más alto de prudencia durante la autorización de la escritura hubiese alertado al notario sobre la irregularidad de que adolecía la subasta celebrada.

Ya hemos señalado que "[e]n la práctica notarial con rareza se dan las circunstancias de urgencia e imprevisión que a veces frustran la abogacía por lo que son contadas las ocasiones en que un notario pueda acogerse al palio de olvido, inadvertencia o negligencia excusable." *In re* <u>Meléndez Pérez</u>, ante, a la pág. 775. Ciertamente, la "notaría es faena de tiempo y paciente integración de todos los elementos documentales, que sufre su calidad con la festinación y la atracción de los atrechos fáciles." <u>Empire Life Ins. Co.</u> v. <u>Registrador</u>, 105 D.P.R. 136, 139 (1976). Son, precisamente, tales "atrechos fáciles" los que

---

elementales de la profesión y que en aquellas ocasiones en que tenga duda sobre lo expresado por el otorgante indague más allá de lo requerido comúnmente." *In re* <u>Vera Vélez</u>, ante.

pervierten la función notarial, convirtiéndose en fantasmas de la ineptitud y precursores de una práctica lesiva a la fe pública.

III

En virtud de lo antes expuesto, forzoso resulta concluir que con su proceder el Lcdo. Davison Lampón faltó a su deber como custodio de la fe pública. Como notario, éste tenía la indeclinable obligación de cerciorarse de la legalidad del negocio jurídico que autorizaba. No lo hizo. Los hechos demuestran que falló al no realizar un examen cuidadoso de los documentos que tuvo ante sí, faltando así a su deber como "primer calificador" de las escrituras que autoriza. Ello lo llevó a obviar por completo lo establecido en la Ley Hipotecaria con relación a la celebración de las ventas judiciales y a prestar un pobre asesoramiento a los contratantes que ante él acudieron. En vista de las circunstancias particulares del presente caso, y considerando el hecho de que el Lcdo. Davison Lampón lleva treinta y cuatro años en la práctica de la profesión legal, siendo ésta la primera ocasión en que falta a sus obligaciones profesionales y éticas, consideramos procedente imponerle una sanción económica de $500.00.[24]

---

[24] Sanción que deberá ser depositada por el Lcdo. Davison Lampón, mediante cheque certificado a nombre del Secretario de Hacienda, en la Secretaría del Tribunal dentro del término de veinte días contado el mismo a partir de la fecha de la notificación de la presente Opinión y Sentencia.

Huelga decir que apercibimos al Lcdo. Davison Lampón para que en el futuro cumpla fielmente con los principios y postulados propios de nuestro ordenamiento notarial, so pena de la imposición de severas sanciones disciplinarias. Del mismo modo, deberá cesar en su práctica de fotocopiar documentos en escrituras matrices.

Se dictará Sentencia de conformidad.

FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

José Davison Lampón

AB–1997–14

SENTENCIA

San Juan, Puerto Rico, a 12 de mayo de 2003

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia imponiendo una sanción económica de $500.00 al Lcdo. José Davison Lampón.[1] Se apercibe a éste para que en el futuro cumpla fielmente con los principios y postulados propios de nuestro ordenamiento notarial, so pena de la imposición de severas sanciones disciplinarias. Del mismo modo, deberá cesar en su práctica de fotocopiar documentos en escrituras matrices.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez no intervino

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

---

[1] Sanción que deberá ser depositada por el Lcdo. Davison Lampón, mediante cheque certificado a nombre del Secretario de Hacienda, en la Secretaría del Tribunal dentro del término de veinte días contado el mismo a partir de la fecha de la notificación de la presente Opinión y Sentencia.